THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:09-CV-67-FL

GUSTAVE E. DOLFAX, III,           )
                                  )
    Plaintiff/Claimant,           )
                                  )
        v.                        )        **MEMORANDUM AND**
                                  )        **RECOMMENDATION**
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
    Defendant.                    )

This matter is before the Court on the parties' cross motions for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). Claimant Gustave Dolfax ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB") payments. Claimant responded to Defendant's motion and the time for filing a reply has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this Court recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding the case to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant filed an application for DIB and SSI payments on 5 August 2005, alleging disability beginning 1 April 2004.[1] (R. 47, 92, 116). His claim was denied initially and upon

---

[1] During the administrative hearing, with the advice and consent of counsel, Claimant amended his alleged onset date to 1 September 2004. (R. 14, 29).

reconsideration. (R. 46-47, 76, 88). A hearing before the Administrative Law Judge ("ALJ")
was held on 6 June 2007, at which Claimant was represented by counsel and a vocational expert
("VE") appeared and testified. (R. 26-45). On 12 October 2007, the ALJ issued a decision
denying Claimant's request for benefits. (R. 11-25). Claimant then requested a review of the
ALJ's decision by the Appeals Council, and submitted additional evidence as part of her request
(R. 457-74). After reviewing and incorporating the additional evidence into the record, the
Appeals Council denied Claimant's request for review on 5 March 2009. (R. 3-6). Claimant
then filed a complaint in this Court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under
the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether
substantial evidence supports the Commissioner's factual findings and whether the decision was
reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d
514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by
substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is
"evidence which a reasoning mind would accept as sufficient to support a particular conclusion."
*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a
"large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it
is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at
642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh
conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the
Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d

2

585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," *i.e.*, currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

In this case, Claimant alleges the following errors by the ALJ: (1) improper evaluation of the treating physicians' opinions; (2) improper assessment of Claimant's credibility; (3) improper assessment of Claimant's residual functional capacity ("RFC"); and (4) failure to pose a hypothetical to the VE that adequately reflected Claimant's RFC. Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on the Pleadings at 6. ("Pl.'s Mem.").

3

# FACTUAL HISTORY

## I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 16). Next, the ALJ determined that Claimant suffers from degenerative disc disease of the lumbar and cervical spine, which is a severe impairment. *Id.* However, at step three, the ALJ concluded this impairment was not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform a significant range of sedentary work[2] that did not involve climbing ladders, scaffolds or ropes; reaching overhead; or exposure to gases, pulmonary irritants, or unprotected machinery. (R. 17-18). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 18). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work. (R. 23). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of

---

[2] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a); Soc. Sec. Rul. ("S.S.R.") 96-9p, 1996 WL 374185, at *3. "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. S.S.R. 96-9p, 1996 WL 374185, at *3. A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. § 404, Subpt. P, App. 2, Table 1. *Id.*

adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 24).

## II.  Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 42 years old and unemployed. (R. 29).  Claimant is a high school graduate with two years of college education. (R. 29).  Claimant retired from the military in 2004. (R. 30).

Claimant testified that he is unable to work due to lower back pain that radiates to his hips, legs, knees and the top of his feet and neck pain that radiates primarily into his right arm. (R. 30-31).  He also testified to experiencing muscle spasms in his lower back and numbness in his right hand.  *Id.*  To alleviate the pain, Claimant rests the majority of the day. (R. 31).  While Claimant takes medication, he explained his medications "just take the edge off" and he experiences numerous side-effects, including sleepiness, dizziness and constipation. (R. 32). Claimant testified further that he had difficulty tolerating his medications given his "liver problem."[3] *Id.* Claimant cannot drive after taking his medication.  *Id.*  Claimant complained of difficulty sleeping at night due to pain but noted some improvement with prescription medication. (R. 36).  Claimant testified also that the pain affects his ability to concentrate. (R. 38).

Claimant cannot stand in one place or sit in one position for more than 10 to 15 minutes. (R. 33-35).  He experiences back pain when he carries or lifts light items and is unable to bend over to pick up items from the floor. (R. 36). Claimant is most comfortable lying down on his right side with his legs pulled up. (R. 35).

---

[3]  The hearing transcript contains no further description of Claimant's "liver problem."

Claimant naps twice a day and spends approximately forty percent of his day lying down. (R. 35). Claimant does not often leave the house, but with the aid of a wheelchair, accompanies his wife to the grocery store on occasion. (R. 33, 37). Claimant assists with some household chores, including folding laundry, cooking and paying bills online. (R. 37, 39). Claimant has difficulty putting his shoes on and often relies on his wife. (R. 37).

## III.    Vocational Expert's Testimony at the Administrative Hearing

Luther Pearsall, Ph.D., testified as a VE at the administrative hearing. (R. 39-44). After the VE's testimony regarding Claimant's past work experience (R. 41), the ALJ posed the following hypothetical:

> [A]ssume somebody with [Claimant's] age, education, and work experience, I want it at light; sit/stand at will; no ladders, scaffolds, or ropes; no overhead work; no fumes, odors, gases, airborne irritants, things of that nature; and no hazardous environments such as unprotected heights, moving machinery. Is there work this individual can do?

(R. 41). The VE responded the individual could perform the following unskilled, light positions with a specific vocational preparation ("SVP") time of 2 and provided DOT classification citations along with the number of jobs available in the local and national economies: (1) general cashier - DOT # 211462010, 17,000 locally, 300,000 nationally; (2) grader/sorter/table worker - DOT # 789687146, 3,000 locally, 60,000 nationally; and (3) assembler/bench assembler - DOT # 706687010, 4,000 locally, 85,000 nationally. (R. 42). The VE testified further that assuming the same limitations above, Claimant could perform the following sedentary positions with an SVP of 2: (1) weigher/weight tester - DOT # 539485010, 1,200 locally, 38,000 nationally; (2) telephone quotation clerk - DOT # 237367046, 2,500 locally, 60,000 nationally; and (3) table worker/grader - DOT # 739687010, 2,000 locally, 48,000 nationally. (R. 43). The VE testified

6

further that if the ALJ found Claimant's testimony fully credible, there would be no work that Claimant could perform. (R. 44). When asked by Claimant's counsel whether the jobs about which the VE testified would exist if the hypothetical individual had to avoid bending, could not lift more than 10 pounds and needed to move around and lie down at unpredictable intervals thoughout the day to relieve pain, the VE responded in the negative. *Id.* Finally, the VE testified that his testimony was consistent with the DOT and reminded the ALJ that the DOT does not reference the sit and stand option. *Id.*

## DISCUSSION

### I. The ALJ did not err in evaluating the opinion of Claimant's treating physicians.

Claimant contends the ALJ should have accorded controlling weight to the opinions of Claimant's treating physicians, Sunil Arora, M.D., of the Center for Pain Management and Dean Karras, M.D., of New Hanover Medical Group. Pl.'s Mem. at 9-16. This Court disagrees.

The ALJ must generally give more weight to the opinion of a treating physician because that doctor is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2). However,"[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; *see also Mastro*, 270 F.3d at 178 (citation omitted) (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence"); *Wireman v. Barnhart*, No. 2:05-cv-46, 2006 U.S. Dist. LEXIS 62868, at *23, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5,

7

2006).(stating an ALJ "may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings"); 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

When the ALJ does not give the opinion of a treating physician controlling weight, the ALJ must weigh the opinion pursuant to the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 404.1527(d)(2)-(6); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). Moreover, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

a. *Dr. Arora's opinion*

The first medical opinion at issue appeared in a letter dated 22 August 2005, wherein Dr. Arora stated Claimant was unable to perform any meaningful activity as a result of his back condition. (R. 303). In a declaration dated 15 June 2006, Dr. Arora further opined that Claimant

> should avoid bending and lifting of no more than 10 pounds one time a day. Sitting for prolonged periods is contraindicated. He would have to get up and move around and even lie down at unpredictable intervals through the day to relieve pain related to the disc herniation at L4-5.

(R. 201). Dr. Arora's records demonstrate both an ongoing treating relationship, as Plaintiff's treating pain management physician, and a longitudinal record showing at least twenty-seven

8

separate opportunities to observe, evaluate and treat Plaintiff. (R. 184-217)[4]. While acknowledging Dr. Arora's treatment of Claimant since 2005, however, the ALJ accorded "minimal weight" to Dr. Arora's opinions based on (1) the lack of support for the opinion with the doctor's own treatment notes and (2) Claimant's ability "to go on a driving trip and maintain activities of daily living." (R. 21, 184, 217).

With respect to Dr. Arora's treatment notes, the ALJ discussed in particular a 26 August 2005 progress report wherein Dr. Arora noted that while Claimant needed to alternate between standing and sitting, had an antalgic gait and experienced moderate discomfort, Claimant's condition was nevertheless described as "stable" with the use of Dilaudid and he had adequate lower extremity strength. (R. 19, 21, 210). The ALJ noted also that subsequent progress records from Dr. Arora indicated Claimant's pain level improved with treatment. *See* (R. 184) (28 March 2007 note indicating excellent relief following used of Duragesic patch); (R. 189) (15 November 2006 note indicating pain level of 3 out of 10 following lumbar epidural steroid injection); (R. 190) (2 November 2006 note indicating 50% relief following epidural steriod injection); (R. 193) (13 July 2006 note indicates pain score dropped from 7 to 4 following radiofrequency ablation of medial branches for cervical facet joint C2-3, C3-4 on both sides); (R. 204) (2 March 2006 note indicating pain level of 4 out of 10 following cervical facet medial branch block); (R. 207) (13 December 2005 note indicating pain level 2 out of 10 following lumbar epidural steroid injection); *but see* (R. 208) (18 November 2005 note indicating pain level of 6 out of 10 prior to steroid injection and 8 out of 10 subsequent thereto).

---

[4] Duplicate copies of Dr. Arora's treatment records appear in the administrative transcript. *See* (R. 233-35) (duplicate of R. 208-10); (R. 236-39) (duplicate of R. 211-14); (R. 240-41) (duplicate of R. 217-78); (R. 245-48) (duplicate of R. 207-10); (R. 398-405) (duplicate of R. 211-18).

9

Claimant first argues that the ALJ failed to consider the 26 August 2005 progress report in its entirety and in particular, ignored notations in the medical record that Claimant must "switch from standing and sitting quite frequently," had "[d]iffuse tenderness to palpation noted at L4-5" and was a possible candidate for disc replacement therapy. Pl.'s Mem. at 11; (R. 210). With respect to Claimant's need to switch between sitting and standing, however, the ALJ not only acknowledged this evidence within his decision, but incorporated a sit and stand option into Claimant's RFC. (R. 17, 19). While the ALJ did not mention the "diffuse tenderness" finding or Claimant's potential candidacy for disc replacement therapy, Claimant fails to explain how this evidence would support the functional limitations expressed by Dr. Arora in the two opinions discounted by the ALJ. Upon review of the progress note, the Court finds the ALJ discussed thoroughly the probative evidence found within the August 2005 progress note. *See White v. Astrue*, No. 2:08-CV-20-FL, 2009 U.S. Dist. LEXIS 60309, at *11-12, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009) (noting "[t]o require an ALJ to refer to every physical observation recorded . . . in evaluating [a] claimant's [] pain, or other alleged condition would create an impracticable standard for agency review, and one out of keeping with the law of this circuit"); *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) (noting "a written evaluation of every piece of testimony and submitted evidence is not required").

Claimant argues next that the ALJ erred in relying on pain levels as evidence contradicting Dr. Arora's opinions, and contends further that the ALJ discussed only the pain evidence supporting the ALJ's ultimate finding. Pl.'s Mem. at 12-13; Pl.'s Resp. at 3. Claimant, however, misinterprets the ALJ's decision. The ALJ's discussion of pain levels was in reference to the decrease in pain experienced by Claimant upon receipt of treatment and, as indicated

10

above and discussed in detail by the ALJ, numerous instances exist over Dr. Arora's two year treatment period wherein Claimant experienced some pain relief following treatment. (R. 21, 23). Thus, the ALJ's pain reference was based upon the total course of treatment provided by Dr. Arora and not on isolated instances. Indeed, the ALJ's decision includes an accurate summary of the treatment notes from Claimant's physicians, including Dr. Arora. *See* (R. 22-23). Claimant opines further that the ALJ was "simply wrong to use pain levels . . . of less than 5 to contradict Dr. Arora's statement [dated 15 June 2006], as even pain that can be reduced to levels below 5 can be significant and limiting." Pl.'s Mem. at 12. However, Dr. Arora did not issue any restrictions to Plaintiff during the course of his medical treatment. As the ALJ noted, "treatment notes generally indicate that the claimant has intact strength, sensation and gait[5] following treatment (including several injections) for his degenerative disc disease. . . ." (R. 23, 173, 192, 211, 217, 252).

Finally, Claimant faults the ALJ for citing Claimant's daily activities as a basis for discounting Dr. Arora's opinion. In particular, Claimant argues that the ALJ "has pointed to no evidence that [Claimant] engages in any activities that exceed the limitations . . . [Claimant's] treating physicians have stated he has." Pl.'s Mem. at 12. However, an individual's daily activities are a proper consideration when determining the weight to accord a medical opinion. *See* Soc. Sec. Rul. ("S.S.R.") 96-2p, 1996 WL 374188, at *3 (explaining "[s]ometimes, there will be an obvious inconsistency between the opinion and the other substantial evidence; for example, when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the

---

[5] The ALJ acknowledged that in March 2007, Claimant was noted to have a gait abnormality upon examination; however, Dr. Arora failed to describe the abnormality. (R. 23).

11

statements of the individual's spouse about the individual's actual activities). In March 2005, five months prior to Dr. Arora's opinion that Claimant is not functionally capable of performing any meaningful activity, Dr. Arora noted Claimant was capable of performing various household chores. (R. 217). Such daily activities suggest that Claimant was not incapable of performing meaningful activity.[6]

In considering whether the ALJ's decision is supported by substantial evidence, the Court must also take into account additional evidence incorporated into the record by the Appeals Council, including treatment notes from the Center for Pain Management. Although the Appeals Council discounted the additional evidence (R. 3-4), the Court must review this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y, Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (explaining where the Appeals Council incorporates additional evidence into the administrative record, the reviewing court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [ALJ's] findings"). The additional evidence includes progress notes from Dr. Arora and John Knab, M.D., also of the Center for Pain Management, dated 26 April 2007 through 8 November 2007 (R. 464-74) and a treatment record from Dr. Karras, dated 21 May 2007. These treatment records indicate as of May 2007, Claimant was using a cane and did so

_____

[6] Claimant argues also that a single driving trip to witness the birth of his first grandchild is an unreasonable basis "to cast any significant doubt on the overall credibility of . . . [Claimant's] treating physicians." Pl.'s Resp. 6. The Court notes, however, that Claimant testified to an inability to sit in one position for more than 10 to 15 minutes. (R. 33-35). Regardless, even were the Court to disagree with this particular finding, it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Rather, the Court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co.*, 131 F.3d at 439-40.

12

through at least July 2007. (R. 467, 469). The records, however, do not indicate that an assistive device was recommended or prescribed and records subsequent to July 2007 do not indicate the extent of Claimant's reliance on an assistive device. (R. 470-74). While Dr. Knab noted in April 2007 that Claimant "walk[s] very gingerly," no other statements appear regarding Claimant's gait with the exception of a July 2007 note describing Claimant's gait as abnormal - the identical description appearing in a March 2007 progress note acknowledged by the ALJ. (R. 23, 184, 464, 469).

Treatment records indicate further that following an occipital nerve block for headaches, Claimant reported a pain level of two out of ten and upon undergoing a radiofrequency ablation of medial branches, Claimant was discharged "in a stable and ambulatory condition." Similar responses to the same procedures were acknowledged by the ALJ. (R. 23, 470, 471); *see* (R. 187) (following a right occipital nerve block in December 2006, Claimant reported zero pain); (R. 194) (following June 2006 radiofrequency ablation, Claimant discharged in a stable and ambulatory condition). Finally, physical examinations in September, October and November 2007 indicated Claimant had no motor or sensory deficit in the upper extremities, 5/5 strength in the bilateral upper extremities, limited flexion and extension due to an increased amount of pain, and tenderness to palpation throughout the lumbosacral spine - similar findings found in records reviewed by the ALJ. (R. 184, 186, 193, 206, 210, 472-74). Accordingly, the Court finds the additional evidence immaterial as it would not have changed the outcome of the ALJ's decision.20 C.F.R. §§ 404.970(b), 416.1470(b); *see Wilkins v. Sec'y, Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citations omitted); *see also Eason v. Astrue*, No.

2:07-CV-30-FL, 2008 U.S. Dist. LEXIS 66820, at *8, 2008 WL 4108084, at *3 (E.D.N.C. Aug. 29, 2008).

In this case, the ALJ discussed his reasons for not accepting all of Dr. Arora's opinions. While Plaintiff attempts to undermine each of these reasons, he has not pointed to any medical evidence which would contradict the ALJ's conclusions. *See Craig*, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"). The ALJ considered the 20 C.F.R. § 404.1527(d) factors which ultimately convinced the ALJ to accord decreased weight to Dr. Arora's opinions. In particular, the absence of a sufficient rationale for Dr. Arora's medical opinions and the inconsistency between the opinions and Dr. Arora's treatment notes reasonably downgraded the true evidentiary value of Dr. Arora's opinions. Additionally, the ALJ complied with S.S.R. 96-2p by making his decision sufficiently specific for subsequent viewers to understand the weight accorded Dr. Arora's opinion and the reasons for said weight. *See Sterling Smokeless Coal Co.,* 131 F.3d at 439-40; *see also Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *2 (4th Cir. 1999) ("An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or h as not given good reason for the weight afforded a particular opinion.") (internal c itations and quotations omitted). Accordingly, the ALJ was within his discretion in not giving controlling weight to Dr. Arora's opinion.

b. *Dr. Karras' opinion*

The medical opinion at issue appeared in a letter dated 12 September 2005, wherein Dr. Karras stated that "[d]ue to the nature of [Mr. Dolfax's] ongoing back pain, functional

14

limitations, and chronic pain syndrome, I feel that [he] is unable to do any meaningful work . . .

." (R. 21, 304).[7] While acknowledging that Dr. Karras was Claimant's treating family practitioner, the ALJ accorded "limited weight" to Dr. Karras' opinion because Dr. Karras did not routinely treat Claimant for his back condition, was not an orthopedic specialist and his opinion was unsupported by the weight of the evidence of record. (R. 21). Claimant argues that "[n]one of these [reasons] provide (sic) a valid basis for discounting Dr. Karras's opinion to the degree the ALJ did." Pl.'s Mem. at 14. Claimant essentially invites the Court to reweigh evidence that has already been considered and weighed by the ALJ. "Ultimately, it is the duty of the [ALJ] reviewing the case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (citation omitted). As discussed above, and noted by the ALJ, treatment records, including those of Dr. Karras, do not support Dr. Karras' opinion that Claimant is incapable of performing meaningful work. *See e.g.*, (R. 173) (Dr. Karras' November 2006 examination revealed Claimant had full range of motion of his neck with intact motor strength, sensation and gait); (R. 252) (same findings upon November 2005 examination). While the additional evidence considered by the Appeals Council includes a May 2007 examination wherein Dr. Karras' noted Claimant's use of a cane, as explained above, there is no indication that the cane was prescribed. (R. 467).

The ALJ considered the 20 C.F.R. § 404.1527(d) factors which ultimately convinced the ALJ to accord decreased weight to Dr. Karras' opinion and also complied with S.S.R. 96-2p by making his decision sufficiently specific for subsequent viewers to understand the weight

---

[7] A duplicate of the September 2005 letter appears in the record at R. 308.

accorded that opinion and the reasons for said weight. *See Sterling Smokeless Coal Co.,* 131 F.3d at 439-40. Accordingly, the ALJ's decision to give Dr. Karras' opinion limited weight was supported by substantial evidence.

**II.     The ALJ improperly assessed Claimant's credibility.**

Claimant argues that the ALJ improperly evaluated his credibility. Pl.'s Mem. at 16. In particular, Claimant contends that the ALJ "did not comply with [Social Security Ruling 96-7p] and did not provide adequate reason (sic) for not finding [Claimant's] testimony regarding his limitations to be credible." *Id.* at 17.

Federal regulations, 20 C.F.R. §§ 416.929(a) and 404.1529(a), provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology. *See Craig,* 76 F.3d at 593. Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.; see also* S.S.R. 96-7p, 1996 WL 374186, at *2. If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of that pain, and the extent to which it affects a claimant's ability to work. *Id.* at 595. The step two inquiry considers "all available evidence," including a claimant's statements about his pain, medical history, medical signs, laboratory findings, any objective medical evidence of pain, evidence of a claimant's daily activities, specific descriptions of pain, any medical treatment taken to alleviate the pain and "any other evidence relevant to the severity of the impairment." *Id.; see also* 20 C.F.R. § 404.1529(c)(3); S.S.R. 96-7p, 1996 WL 374186, at *3. Objective

evidence of pain is not required for entitlement to benefits, although it is appropriately considered where it appears in the record. *See id.* at 595-96.

Despite Claimant's argument to the contrary, the ALJ followed the analysis outlined in *Craig* as prescribed. The ALJ summarized at length medical records between September 2004 and March 2007. Moreover, pursuant to S.S.R. 96-7p, the ALJ noted the following: (1) inconsistency between Claimant's testimony and his report of daily activities to Dr. Arora; (R. 217); (2) Claimant's complaints of chronic low back and neck pain with radiation to his feet and arms, muscle spasms and knots in Claimant's low back, and hand numbness; (3) Claimant's testimony that his pain is aggravated when standing or sitting for too long; (4) Claimant's use of dilaudid, duragesic patches and receipt of lumbar epidural steroid injections, cervical facet injection, improvement in Claimant's pain levels following treatment, and Claimant's complaints of side effects including grogginess, sleepiness and constipation; (5) Claimant's use of a wheelchair and cane yet the lack of treatment notes indicating dysfunction of a level requiring either; (6) Claimant's relief from some pain when lying down on his right side with his legs pulled up; and (7) Claimant's statement that pain disrupts his sleep at night. (R. 19-23). Indeed, Claimant does not seriously contend otherwise but complains that the reasons for discrediting the Claimant's subjective representations were not substantial and, in many instances, simply inaccurate. In other words, while the ALJ may have addressed all of the credibility factors identified in *Craig* and the regulations, the evidence discussed by the ALJ in reference to these factors was problematic.

First, Claimant alleges that the ALJ provided an inaccurate characterization of Claimant's consideration of surgery. Pl.'s Mem. at 17. In evaluating Claimant's credibility, the ALJ faulted

17

Claimant for failing to seek out "surgery and other procedures [] recommended on several occasions" or "low cost to no cost medical treatment within his surrounding community (including the possibility of treatment at the VA Medical Center"). (R. 20); *see* S.S.R. 96-7p, 1996 WL 374186, at *8 (listing numerous examples that may provide insight into the claimant's credibility including testimony that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services"). In support of his argument, Claimant cites a 13 July 2006 progress report wherein Dr. Arora noted his discussion with Claimant about the possibility of intradiscal electrothermic treatment ("IDET") and his concern about performing this procedure "because of lack of positive outcome, and difficulty in getting approval from the insurance companies." (R. 193).

A review of Dr. Arora's progress notes indicates the following treatment options were discussed with Claimant: long-term opioid management, non-surgical interventions (e.g., nucleoplasty, IDET) and disc replacement or fusion (R. 191, 203-04, 206, 208, 208, 210-12, 214). Numerous progress notes by Dr. Arora from 2005 characterize Claimant as a candidate for disc replacement surgery and indicate Claimant's interest in having surgery and that he was accordingly referred to Dr. Rodger. (R. 208-13). Upon notifying Dr. Arora that he never received any information from Dr. Rodger's office, Claimant stated he "[was] not pursuing this option for the time being" but would consider nonsurgical interventions. (R. 208). Treatment records from 2006 indicate also Claimant's continued interest in undergoing nonsurgical interventions before considering surgery. (R. 196, 204). Despite Dr. Arora's concerns noted in the 13 July 2006 progress note, on 25 October 2006, Dr. Arora discussed again with Claimant the option of IDET (as well as nucleoplasty), noting that his medical office must "submit some

18

documentation and evidence of support in the form of publications to get the approval for this option." (R. 191). Subsequent records from Dr. Arora, including the additional evidence submitted to the Appeals Council, do not indicate whether the appropriate documentation was filed or whether approval was granted by Claimant's insurance company.    In early 2007, Claimant agreed to enrollment in an aquatic therapy program, which he was scheduled to begin in late March. (R. 185-86).  However, subsequent treatment records, including the additional evidence submitted to the Appeals Council, provide no discussion regarding aquatic therapy with the exception of the notation in Dr. Knab's 8 November 2007 treatment record that Claimant "will follow-up in two months with Dr. Arora to see if there are any additional medications or therapies that we could consider for him." (R. 474).  That same record contains also Dr. Knab's opinion that Claimant "is [not] an excellent candidate for surgery due to the significant amount of degenerative disease that he has throughout his cervical and lumbar spine." (R. 474).

Based on the treatment notes, the Court finds the ALJ's reliance on Claimant's alleged failure to pursue other treatment, including "low cost" or "no cost" medical treatment, is misplaced.  While earlier records indicate Claimant decided against surgery, records submitted to the Appeals Council indicate surgery was not a viable option.   Indeed, the record is inconclusive as to the reason Claimant did not pursue surgery. As for Claimant's alleged failure to pursue low-cost medical services, the Court found no statements in the record suggesting Claimant's inability to afford medical care.  Indeed, the evidence indicates that Claimant had access to both medical treatment and medication and there is no evidence wherein Claimant's treating physicians advised Claimant to seek out low-cost options.  Accordingly, Claimant's

19

alleged failure to pursue other treatment options does not provide the substantial evidence necessary to undermine Claimant's credibility.

Second, Claimant characterizes as incorrect the ALJ's statement that "no chronic side effects were noted in the longitudinal medical evidence of record and the claimant routinely denied any constipation." *See* Pl.'s Mem. at 18; (R. 20). In support of his argument, Claimant cites medical records from June 2005 and July 2005 wherein Dr. Arora noted that Claimant reported "significant side effects including sweating and stomach irritation," "a medicine head feeling,""mild constipation" and "feel[ing] tired." Pl.'s Mem. at 18; (R. 212-13). Claimant contends further that treatment records from 2007 "show ongoing reports of side effects from medication." *Id.* Despite Claimant's contention to the contrary, a review of the medical records supports the ALJ's findings. For example, numerous records from 2006 and 2007 indicate that Claimant denied experiencing nausea, vomiting, dizziness, drowsiness, or constipation. (R. 172, 184-186, 191-93, 472-73). In fact, during this time period, complaints of constipation and nausea appear only in a single treatment record dated 8 November 2007. (R. 474). While some records indicate complaints of daytime sleepiness (R. 172, 177, 473), the majority of records do not. (R. 184-86, 188, 191, 464, 472, 474).

Third, Claimant contends that the ALJ "stated incorrectly" that "the claimant has never apparently been prescribed with a wheelchair or cane and treatment notes fail to indicate dysfunction of a level requiring such," providing no further argument. Pl.'s Mem. at 18 (R. 20) However, as discussed previously, the evidence of record supports the ALJ's finding.

Fourth, Claimant takes issue with the ALJ's finding that "no chronic liver problems, as documented by ultrasound testing and biopsy were found." Pl.'s Mem. at 18-19; (R. 20). In

20

particular, Claimant cites a 26 September 2005 progress report wherein Claimant informed Dr. Arora of Dr. Karras' finding that Claimant's "liver enzymes were a little elevated" and Dr. Karras' request that Claimant "stop all medications." *Id*; (R. 209). Claimant cites also a 23 November 2005 progress note wherein Dr. Karras noted that Claimant's liver function tests ("LFTs") remain elevated. *Id.*; (R. 253). However, this evidence does not contradict the ALJ's findings as Claimant would have the Court conclude. For example, during Claimant's May 2006 appointment with Dr. Karras, it was noted that Claimant had a "[history] of mildly elevated LFTs with a neg[ative] liver biopsy and stability on last blood count." (R. 177). The Court notes further that subsequent progress notes by Dr. Karras, including the additional evidence considered by the Appeals Council, do not mention Claimant's liver enzymes or LFTs. (R. 173, 467). While a May 2007 progress note by Dr. Arora, reviewed by the Appeals Council only, states that Claimant "would like to get off of the Percocet as he feels that the elevated liver enzymes that he has had for three years could be escalated with a large amount of Tylenol," Dr. Arora noted that Claimant had no problems with methadone or OxyContin. (R. 464). Thus, while acknowledging Claimant's testimony that he had difficulty tolerating medications due to accompanying liver problems (R. 19), the evidence shows that Claimant's liver problems were not such that Claimant could not take medications for his impairments. Accordingly, the ALJ was justified in commenting on the absence of objective evidence indicating a chronic condition concerning Claimant's liver as a result of the medications taken for his degenerative disc disease.

Next, Claimant contends the ALJ "is mistaken in only considering the list of activities [Claimant] does and in failing to consider the limitations [Claimant] has in performing them." Pl.'s Mem. at 19. Certainly, evidence of daily activities is highly probative to the credibility

21

analysis. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Craig*, 76 F.3d at 594 (noting the factors to be considered in the credibility process include evaluation of plaintiff's activities). The ALJ's discussion of Claimant's daily activities was obviously only one consideration among many in determining the extent to which his symptoms affect his ability to perform basic work activities. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (holding that a claimant's daily activities can suggest claimant is not disabled). While an explanation as to how the daily activities performed are evidence that Claimant can in fact perform as found by the ALJ would have improved the ALJ's decision, the Court cannot remand on this basis alone. Moreover, to the extent Claimant faults the ALJ's reliance on Claimant's single driving trip, the Court notes the ALJ nevertheless incorporated a sit and stand option into Claimant's RFC. Nevertheless, when viewed in combination with the entirety of the credibility analysis, the discussion seems wanting.

Finally, Claimant criticizes the ALJ's reliance on a treatment note indicating Claimant filled his prescriptions for narcotics medications early, thereby suggesting to the ALJ that that Claimant had a drug abuse problem. Pl.'s Mem. at 19; (R. 20). In particular, Claimant argues that the ALJ ignored subsequent treatment records indicating a lack of drug abuse. Pl.'s Mem. at 19. In summarizing Claimant's medication compliance, the ALJ found that "[t]he medical evidence reveals that claimant was found to take more medications that he should or none at all some days. Additionally, he was found to be out of his medications on occasion. Treatment notes also indicate that the claimant was filling his narcotic prescriptions early each month." (R. 20).

On 27 March 2006, Dr. Arora discovered that Claimant was taking 2 Percocets every four hours despite instructions directing Claimant take only two per day. (R. 203). However, noting Claimant "ha[d] been a compliant patient without any red flags," Dr. Arora concluded that Claimant "had some misunderstanding and ended up taking more medication." *Id.* Similarly, on 13 July 2006, Dr. Arora noted that Claimant had been filling the prescriptions for OxyContin and Percocet early each month and as 13 July 2006, and despite Claimant's denial, Claimant should have had a surplus of opioids for at least a period of three weeks. (R. 193). Dr. Arora noted further however that he "consider[ed] [Claimant] a good patient and assume[d] that the mistake was unintentional." *Id.* Finally, Dr. Arora noted that Claimant had failed to fill his prescription for Zonegran, which was prescribed during a prior medical visit. *Id.* Dr. Arora provided Claimant with another prescription for Zonegram and advised Claimant that he was to begin taking the medication as prescribed. *Id.*

With respect to potential substance abuse, subsequent records support Dr. Arora's assumption to the contrary as no notations appear accusing Claimant of filling his prescriptions too early. In fact, on 25 September 2006, Dr. Arora noted in particular that "[t]here are no drug abuse issues." (R. 192). However, as noted by Claimant, the ALJ's opinion does not acknowledge this observation made by Dr. Arora. (R. 23). While Dr. Arora noted also that Claimant had still not started taking Zonegran, subsequent progress notes do not list Zonegram as one of Claimant's prescribed medications.

A review of the records subsequent to Dr. Arora's July 2006 warning to Claimant convinces the Court that the ALJ's reliance on Claimant's alleged "treatment noncompliance" has been overstated to a problematic degree. While it is not the province of this court to weigh the

23

evidence considered by the ALJ, the court must consider whether the ALJ considered and analyzed all the relevant evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. The ALJ may not select and discuss only that evidence that favors his ultimate conclusion. *See Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000) (explaining the ALJ "cannot 'pick and choose' only the evidence that supports his position"); *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("In addition to discussing the evidence supporting his decision in a social security disability benefits case, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

Without discussion of the particular errors alleged by Claimant, Defendant provides a general defense of the ALJ's credibility finding. The Court agrees that the ALJ cited numerous bases for rejecting Claimant's subjective representations as not wholly credible. While it is evident that the ALJ attempted to provide a thorough credibility analysis, the Court finds, however, that too many reasons for the credibility finding (failure to seek out recommended treatment, failure to pursue low-cost medical services, alleged drug abuse and Claimant's daily activities) are either unexplained or not thoroughly presented. Accordingly, the Court cannot find that the ALJ's credibility finding is supported by substantial evidence. *See Ivey v. Barnhart*, 393 F. Supp. 2d 387, 390 (E.D.N.C. 2005) (remand is appropriate where ALJ fails to discuss relevant evidence weighing against his decision) (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)).

Because this Court finds that remand on the issue of credibility will affect the remaining issues raised by Claimant, it does not address those arguments.

24

**CONCLUSION**

For the reasons stated above, this Court RECOMMENDS Claimant's Motion for Judgment on the Pleadings be GRANTED, Defendant's Motion for Judgment on the Pleadings be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 18th day of March, 2010.

Robert B. Jones, Jr.
United States Magistrate Judge